

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| THE HISPANIC LEADERSHIP FUND, INC., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:12cv893 |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This federal election law declaratory judgment case presents two unusual questions:

(i) Whether a plaintiff seeking a declaratory judgment that certain advertisements to be published in the election season do not trigger the Federal Election Campaign Act's[1] ("FECA") disclosure requirements meets Article III's standing and ripeness requirements where, as here, the Federal Election Commission ("FEC") deadlocked on the advertisements and then voted 6:0 that it could not reach a conclusion on them; and,

(ii) Whether an advertisement that criticizes or targets the oil or healthcare policies of "the Administration," "the White House," or "the Government" makes it unambiguously apparent, by context, that the advertisement identifies a specific federal candidate—President Obama—and thus constitutes an electioneering communication under FECA.

For the reasons that follow, the ripeness and standing jurisdictional requirements are met

and some, but not all, of the advertisements at issue are "electioneering communications" subject

to FECA's disclosure requirements.

---

[1] The Federal Election Campaign Act of 1972, Pub.L. 92-225, 86 Stat. 3 (codified as amended at 2 U.S.C. §§ 431 *et seq.*)

1

## I.

The Hispanic Leadership Fund ("HLF"), a Virginia non-profit corporation, is a 501(c)(4)[2] organization that makes public communications on both federal and state policy matters. HLF plans to run a series of advertisements during the 60 days leading up to the 2012 presidential election and is concerned that the advertisements may be deemed by the FEC or the Department of Justice—erroneously in HLF's view—electioneering communications. The significance of this is that during the 60 days preceding a federal election, entities may only publish electioneering communications if they comply with FECA's disclosure requirements. 2 U.S.C. § 434(f). An electioneering communication is "any broadcast . . . communication which . . . refers to a clearly identified candidate for federal office [and] is made within . . . 60 days before a general . . . election for the office sought by the candidate." 2 U.S.C. § 434(f)(3)(A). An entity that fails to make the required disclosures prior to publishing advertisements that constitute electioneering communications may be subject to FEC civil enforcement actions originating by either independent FEC investigations[3] or private party complaints to the FEC [4], as well as criminal prosecution by the Department of Justice.[5]

---

[2] 26 U.S.C. 501(c)(4) exempts "civil leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare" from federal income taxation.

[3] 2 U.S.C. § 437g (a).

[4] 2 U.S.C. § 437g (a)(1). And the FEC's decision not to investigate a private party complaint is subject to judicial review in a district court action brought by the private party complainant. 2 U.S.C. § 437g (a)(8); *see Fed. Election Comm'n v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471 (D.C. Cir. 1992). The private party complainant only has standing to bring suit directly against the alleged violator where a district court declares that "the [FEC's] dismissal of the [private] complaint or the [FEC's] failure to act is contrary to law" and the FEC fails to conform "with such declaration within 30 days." 2 U.S.C. § 437g (a)(8)(C).

[5] 2 U.S.C. § 437g (d).

Given the potentially onerous consequences that may result from a failure to comply with FECA's disclosure requirements, prior to publishing advertisements that may later be deemed to be electioneering communications, entities may seek and obtain an FEC advisory opinion prior to publication as to whether the advertisements constitute electioneering communications. The advisory opinion, if issued in the entity's favor, provides a safe harbor, meaning that the entity "shall not . . . be subject to any sanction provided by [FECA] or by chapter 95 or chapter 96 of Title 26." *See* 2 U.S.C. 437f (c)(2).[6]

HLF has not sought an advisory opinion pursuant to § 437f (c)(2). Nonetheless, another organization, the American Future Fund ("AFF") has sought an advisory opinion on various advertisements, including those essentially identical to the advertisements at issue here. HLF may appropriately rely on that opinion because FECA allows other entities to rely on advisory opinions when they plan to engage in identical activity.[7] And with respect to AFF's advertisements that are essentially identical to HLF's, the FEC deadlocked—a 3:3 vote—as to whether the advertisements constituted electioneering communications and then, by a 6:0 vote, issued an advisory opinion stating that it could not reach a decision regarding the advertisements.

---

[6] Section 437f (c)(2) provides that

> Notwithstanding any other provisions of law, any person who relies upon any provision or finding of an advisory opinion in accordance with the provisions of paragraph (1) and who acts in good faith in accordance with the provisions and findings of such advisory opinion shall not, as a result of any such act, be subject to any sanction provided by this Act or by chapter 95 or chapter 96 of Title 26.

[7] Section 437f (c)(1)(B) provides that

> Any advisory opinion rendered by the Commission under subsection (a) of this section may be relied upon by . . . any person involved in any specific transaction or activity which is indistinguishable in all its material aspects from the transaction or activity with respect to which such advisory opinion is rendered.

## A. HLF's Proposed Advertisements

Here, HLF submits five advertisements that it plans to publish during the 60 day period preceding the federal presidential election, and seeks a declaratory judgment that each of the five advertisements does not constitute an electioneering communication under FECA.[8]

### 1. Advertisement One

Advertisement One focuses on government policy regarding foreign oil. The advertisement begins with video images of gas prices and gasoline pumps, while an announcer says, "Since this Administration began, gas prices are up 104%. And the U.S. *still* spends over $400 billion a year on foreign oil." The advertisement continues, showing an image of the White House while the announcer says, "The White House *says*: We must end our dependence on foreign oil." The video then changes to images of oil rigs and science labs, while the announcer says, "But the Administration *stopped* American energy exploration[.]" The video then changes to stock footage "of 'Denied' Stamp with image of [the] White House," while the announcer states "and *banned* most American oil and gas production—the White House wants *foreign* countries to drill—so we can buy from *them*." The video then changes to an image described only as "Middle East oil" as the announcer states "*Keeping* us dependent on foreign oil—and crippling our economy." The advertisement closes by showing the onscreen text "Call the White House at (202) 456–1414," while the announcer says, "Tell the White House it's time for an American energy plan . . . that actually works for *America*."

---

[8] Although HLF has not yet produced the advertisements, HLF has concrete written plans for the advertisements.

## 2. Advertisement Two

Advertisement Two also focuses on government policy regarding foreign oil. This advertisement also begins with video images of gas prices and gasoline pumps, while the announcer states, "Since 2008 began, gas prices are up 104%. And the U.S. *still* spends over $400 billion a year on foreign oil." The advertisement then shows an image of the Washington Monument, while the announcer states, "The government *says*," followed by an audio clip of President Barack Obama saying, "We must end our dependence on foreign oil." The video then changes to images of oil rigs and science labs, while the announcer states, "But the government *stopped* American energy exploration[.]" The video changes to stock footage of a "'Denied' Stamp with image of [the] Washington Monument," while the announcer states "and *banned* most American oil and gas production—the government wants *foreign* countries to drill—so we can buy from *them*." The video then changes to an image described only as "Middle East oil" as the announcer states "*Keeping* us dependent on foreign oil—and crippling our economy." The advertisement closes by continuing to show the Middle East oil image, while the announcer states, "Tell the government it's time for an American energy plan . . . that actually works for *America*."

## 3. Advertisement Three

Advertisement Three also focuses on government policy regarding foreign oil. This advertisement also begins with video images of gas prices and gasoline pumps, while the announcer states, "Since 2008 began, gas prices are up 104%. And the U.S. *still* spends over $400 billion a year on foreign oil." The advertisement then shows an image of the Washington Monument, while the announcer states, "The government says," followed by an audio clip of the White House Press Secretary saying "We must end our dependence on foreign oil." The video

then changes to images of oil rigs and science labs, while the announcer states, "But the government *stopped* American energy exploration[.]" The video changes to stock footage of a "'Denied' Stamp with image of [the] Washington Monument," while the announcer states "and *banned* most American oil and gas production—the government wants foreign countries to drill—so we can buy from them." The video then changes to an image described only as "Middle East oil" as the announcer states, "*Keeping* us dependent on foreign oil—and crippling our economy." The advertisement closes by showing the onscreen text "Call the White House at (202) 456–1414," while the announcer says, "Tell the government it's time for an American energy plan . . . that actually works for *America*."

    4. Advertisement Four

    Advertisement Four focuses on government policy regarding religious liberties. This advertisement opens with a series of images described as "Americana," "the Washington Monument," "the United States Supreme Court courthouse," and "the United States Capitol," while the announcer states, "The most basic American right . . . the First Amendment freedom of religion." The advertisement then shows images of the Department of Health and Human Services building, while the announcer states, "But the Administration is taking a stand on a critical question of religious liberty. *Against* the U.S. Catholic bishops . . . and people of faith across the country." The advertisement then shows images of churches and families, while the announcer states, "Forcing religious institutions to pay for abortion-causing drugs . . . Violating their conscience and religious beliefs." The advertisement then closes by showing White House footage and images with the onscreen text "Call Secretary Sebelius at 1-877-696-6775," while the announcer says, "Call Secretary Sebelius, tell her it's wrong for her and the Administration to trample the most basic American right."

5. Advertisement Five

Advertisement Five focuses on government policy regarding health care. The advertisement opens with video of a toddler throwing a tantrum while the announcer states, "The Terrible Twos." The image then changes to a frustrated parent holding a toddler, while the announcer states, "All parents dread the phase." The text, " 'White House will not mark two year anniversary' of health care law (Washington Free Beacon, 3/19/12)," is displayed, while the announcer states, "And now that government run healthcare is turning two, its own parents don't even want to celebrate. The health care law is showing all the Terrible Two warning signs[.]" The advertisement then shows videos of toddlers, while the announcer states, "Mood swings . . . Temper tantrums[.]" As the video continues, the text "[As much as a ] '3 percent increase in health insurance premiums' (FactCheck.org, 1/4/12)" is displayed as the announcer states, "It was supposed to lower premiums, now it's going to cost you more." The text then changes to "'CBO: . . . to cost twice as much' (Fox News, 3/16/12)," while the announcer states, "Yes, the Terrible Twos are more expensive than you think[.]" The onscreen text changes to "[Many workers] 'will not, in fact, be able to keep what they currently have' (Time, 6/24/10)," while the announcer states, "The toddler will tend to say 'no' a lot." The onscreen text then changes to "'. . . allies get waivers . . .' (Washington Examiner, 5/23/11)," while the announcer states, "Some parents will give in to the child's every demand. Doing so can have short term benefits, but in the long term, this will create a monster." The toddler sequence then closes with the on-screen text changing to "'crushing penalties' (Human Events, 3/4/12)," while the announcer states, "Sadly, most parents have to pay the price for not complying with these mandates." The image then changes to the text, "'White House will not mark two-year anniversary' of health care law (Washington Free Beacon, 3/19/12)," while the announcer then states, "So . . . Since its family

won't wish its health care law a happy birthday[.]" The image then changes to the text, "Happy 2nd Birthday, Meh" and "HispanicLeadershipFund.org," as the announcer states, "I guess we'll have to. Happy Birthday national, government healthcare, may none of your wishes come true."

## B. Proceedings before FEC

As noted, AFF submitted an advisory opinion request to the FEC, seeking guidance as to whether a series of eight advertisements, including five advertisements identical to the five proposed here by HLF, constituted electioneering communications, that is, whether the proposed advertisements contained contextually unambiguous references to clearly identified candidates for federal office, as defined by 2 U.S.C. § 431(18).

The FEC scheduled AFF's request for an advisory opinion to be addressed at an open meeting of the Commissioners on June 7, 2012. In preparation for the meeting, the FEC posted the request on the FEC's website for public comments.[9] In addition, the FEC's General Counsel prepared two draft responses to AFF's request: Draft A stated that "none of AFF's proposed advertisements would constitute an electioneering communication" and Draft B stated that "seven of AFF's eight proposed advertisements would constitute electioneering communications." The FEC—which may only act by a majority of the commissioners[10]—failed to adopt Draft A by a 2:4 vote and failed to adopt Draft B by a 3:3 vote. Then, the FEC reached three additional decisions. First, by a 4:2 vote, the FEC decided that two of AFF's proposed advertisements, those that made reference to "Obamacare" and "Romneycare," were

---

[9] Section 437f (d) requires that the FEC "shall make public any request made under subsection (a) of this section for an advisory opinion. Before rendering an advisory opinion, the [FEC] shall accept written comments submitted by any interested party[.]"

[10] 2 U.S.C. § 437c (c) (The FEC may only exercise its power under FECA "by a majority vote of the members of the Commission.").

electioneering communications because they contained references to clearly identified candidates for federal office, specifically the names of Democratic candidate President Barack Obama and Republican candidate Governor Mitt Romney.[11] In reaching this conclusion, the FEC explained that each of these advertisements included a clear reference to the name of a candidate for federal office[12] and that the name was not part of the official name of a bill or statute. Second, by a 6:0 vote, the FEC concluded that one of AFF's proposed advertisements that referenced only "the government," the "Department of Health and Human Services," and "Secretary Sebelius," was not an electioneering communication because it did not contain a reference to a clearly identified candidate for federal office. Third, by a 6:0 vote, the FEC concluded that it was unable to reach any further conclusions with respect to AFF's remaining proposed advertisements. Thus, with respect to HLF's five advertisements here in issue, it is clear that the FEC has reached no conclusion and has declined to issue a safe harbor ruling covering any of the advertisements.

Because the FEC was unable to reach a decision on AFF's request for an advisory opinion, HLF brought this action for a declaratory judgment. In bringing this action, HLF, pursuant to § 437f, relies on the FEC's conclusion that it was unable to reach any decision with respect to the advertisements. It further notes that any additional requests for advisory opinions by HLF would likely be futile, given the FEC's inability to reach any conclusion on AFF's request.

---

[11] HLF does not challenge this decision by the FEC, as none of their proposed advertisements use the terms "Obamacare" or "Romneycare."

[12] The definition section of FECA, 2 U.S.C. § 431(18), provides that "the term 'clearly identified' means that . . . the name of the candidate involved appears[.]" 2 U.S.C. § 431 (18)(A).

Shortly following the filing of this action, HLF also sought a preliminary injunction, to enjoin the FEC from enforcing the FECA disclosure provisions with regard to these advertisements. In the course of the preliminary injunction hearing, the parties agreed that no discovery or testimony was necessary for the trial on the merits. Accordingly, it became apparent that it would be appropriate to consolidate the hearing on the preliminary injunction with an accelerated trial on the merits, pursuant to Rule 65(a)(2), Fed.R.Civ.P. At the trial on the merits, further briefing was ordered on the standing and ripeness issues, as well as whether this matter was amenable to resolution by a declaratory judgment.

In its additional brief, HLF argued that it had Article III standing because (i) the three elements for standing as set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), were met and (ii) the requirements for standing are relaxed in the context of a First Amendment pre-enforcement challenge. HLF also argued that this declaratory judgment action was ripe for adjudication because a definite and concrete controversy exists between the parties and because HLF's speech is chilled by the threat of civil or criminal enforcement actions against it.

In contrast to HLF's consistent position on standing and ripeness, the FEC has vacillated on these issues, initially taking the position that HLF does have standing and that the dispute is ripe for adjudication by declaratory judgment,[13] but later, at trial, taking the position that HLF does not have standing and that the matter is not ripe for declaratory judgment. In essence, the FEC argues that HLF does not have a sufficiently credible fear of prosecution and, therefore, its

---

[13] In the FEC's supplemental brief, the FEC stated that "HLF has alleged sufficiently concrete facts to demonstrate Article III standing in this pre-enforcement challenge" and "if HLF were entitled to any relief (which it is not), the Court would have the discretion to issue a judgment under the Declaratory Judgment Act."

speech is not sufficiently chilled to give rise to a dispute that is ripe for adjudication.[14] But, when asked whether the FEC would agree not to prosecute HLF if it published the advetisements without disclosure, the FEC declined to so agree. Following these arguments on standing and ripeness, the trial on the merits proceeded, with both parties presenting only oral argument.

## II.

Resolution of the jurisdictional question is informed by a brief description of FECA, the constitutionality of disclosure, and the specific disclosure provisions. When enacted in 1971, FECA represented the "most comprehensive reform legislation (ever) passed by Congress concerning the election of the President, Vice-President, and members of Congress." *Buckley v. Valeo*, 424 U.S. 1, 7 (1976). FECA contained four major changes to election law: (i) it limited the amount individuals could contribute to any particular candidate per election, and the aggregate amount any individual could contribute, (ii) it required disclosures when contributions and expenditures exceeded a certain threshold, (iii) it created a system of public funding for presidential elections, and (iv) it created the Federal Election Commission "to administer and enforce the legislation." *Id.* FECA specifically imposed restrictions on expenditures when made for "express advocacy" but not for issue advocacy. *Id.* at 45–46. In *Buckley*, the Supreme Court upheld FECA's limitations on contributions, but held that the restrictions on expenditures violated the First Amendment. *Id.* at 20–57. In doing so, the Supreme Court held that "campaign contributions and expenditures constitute 'speech' within the protection of the First

---

[14] In contrast to its earlier position in its brief, at trial, when asked whether "there is a dispute that's amenable to declaratory judgment here," the FEC answered, "We would say no, your honor, there is not." Tr. at 18. The FEC further explained, with regard to whether this dispute is amenable to a declaratory judgment, "we think not, because we don't think there is a true imminent risk of credible prosecution. . . . So in terms of any imminent threat that they would face, we don't think it exists."

Amendment." *Emily's List v. Fed. Elec. Comm'n*, 581 F.3d 1, 5 (D.C. Cir. 2009) (citing *Buckley*, 424 U.S. at 14). Further, the Supreme Court noted that restrictions on contributions also restricted the "contributor's freedom of political association." *Buckley*, 424 U.S. at 25. In reviewing restrictions on political association, the Supreme Court applied the "closest scrutiny," meaning that government interests must justify the statutes in light of the closest scrutiny. *Id.* (citing *NAACP v. Alabama*, 357 U.S. 449, 460–61 (1958)). In the end, the Supreme Court, in *Buckley*, applied the "closest scrutiny" and upheld the limitations on campaign contributions, concluding that the limitations were justified by the need to limit the "actuality and appearance of corruption resulting from large individual financial contributions[.]" *Buckley*, 434 U.S. at 26. The Supreme Court further explained that "[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined." *Id.* at 26–27.

With regard to disclosure, the Supreme Court in *Buckley* explained that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* at 64. Thus, compelled disclosure "cannot be justified by a mere showing of some legitimate governmental interest," but, instead, the "subordinating interests of the State must survive exacting scrutiny." *Id.* at 65. The Supreme Court found that three governmental interests justified disclosure in light of exacting scrutiny: (i) "disclosure provides the electorate with information 'as to where political campaign money comes from . . . ,'" (ii) "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity," and (iii) "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to deter violations of the contribution limitations[.]" *Id.* at 66–68.

In the version of FECA that existed at the time of *Buckley*, FECA distinguished between "express advocacy" and "issue advocacy" in determining when to require disclosure.[15] On the one hand, express advocacy referred to communications that "expressly advocate[d] the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 80. On the other hand, issue advocacy referred to communications that ostensibly focused solely on an issue, rather than a particular candidate. *Id.* In *McConnell*, the Supreme Court explained that issue advertisements were often functionally equivalent to express advocacy; for example, an issue advertisement might condemn "Jane Doe's record on a particular issue before exhorting viewers to call Jane Doe and tell her what you think." *McConnell*, 540 U.S. at 127. Unlike express advocacy, which was subject to financing limitations and disclosure requirements, issue advocacy under the originally enacted version of FECA, "not only could be financed with soft money[16], but could be aired without disclosing the identity of, or any other information about, their sponsors." *Id.* at 126.

In 2002, Congress amended FECA by enacting the Bipartisan Campaign Reform Act of 2002 (BCRA). In *McConnell*, the Supreme Court explained that "BCRA's central provisions are designed to address Congress' concerns about the increasing use of soft money and issue advertising to influence federal elections." *Id.* at 132. Beyond imposing new restrictions on the sources of campaign financing, BCRA also "coin[ed] a new term, 'electioneering

---

[15] See *McConnell v. Federal Election Commission*, 540 U.S. 93, 127 (2003), for a discussion of the statutory distinction.

[16] Soft money consists of "[d]onations made solely for the purpose of influencing state or local elections" and "therefore unaffected by FECA's requirements and prohibitions." *McConnell*, 540 U.S. at 122. In addition, soft money, under FECA, "could also be used to defray the costs of 'legislative advocacy media advertisements,' even if the ads mentioned the name of a federal candidate, so long as they did not expressly advocate the candidate's election or defeat." *Id.* at 123.

communications,' to replace the narrowing construction of FECA's disclosure provisions adopted by [the Supreme] Court in *Buckley*." *Id.* at 189. The Supreme Court explained that although *Buckley*'s construction "limited the coverage of FECA's disclosure requirement to communications expressly advocating the election or defeat of particular candidates," the term "'electioneering communication' is not so limited." *Id.* In a facial challenge to "electioneering communication" that alleged the term was overbroad and vague, the Supreme Court explained in *McConnell* that the "term raises none of the vagueness concerns that drove our analysis in *Buckley*." *Id.* at 194. Further, the *McConnell* opinion pointed out that *Buckley*'s "express advocacy limitation . . . was the product of statutory interpretation rather than a constitutional command." *Id.* at 192. Indeed, the First Amendment does not "erect[] a rigid barrier between express advocacy and so-called issue advocacy." *Id.* at 193. And the Supreme Court explained, the same "important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements . . . apply in full to BCRA." *Id.* at 196.

In 2010, the Supreme Court in *Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010), changed course, overruling the part of *McConnell* that had upheld BCRA's "restrictions on corporate independent expenditures." *Citizens United*, 130 S.Ct. at 913. Notably, the Supreme Court did not overrule *McConnell*'s upholding of BCRA's disclosure requirements. Rather, the Supreme Court again upheld these requirements, noting that "[d]isclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking." *Id.* at 914. Thus, "disclosure could be justified based on a governmental interest in 'prov[iding] the electorate with information' about the sources of election related spending." *Id.* (citations omitted). The Supreme Court did note "that as-applied challenges would be available if a group

14

could show a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* (citations omitted).[17]

FECA's specific disclosure provisions, as amended by BCRA, provide that anyone "who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year shall . . . file with the Commission [the disclosure statement.]" 2 U.S.C. § 434(f)(1). The disclosure statement, *inter alia*, must include "the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement" during the time period "beginning on the first day of the preceding calendar year and ending on the disclosure date." 2 U.S.C. § 434(f)(2)(F). An electioneering communication is defined as,

> any broadcast, cable, or satellite communication which . . . refers to a clearly identified candidate for Federal office; . . is made within . . . 60 days before a general, special, or runoff election for the office sought by the candidate; or . . . 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and . . . in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

2 U.S.C. § 434(f)(A). Television advertisements, such as HLF's proposed advertisements, if found to be electioneering communications, would then subject HLF to FECA's disclosure requirements.

---

[17] *See also The Real Truth About Abortion, Inc. v. Fed. Elec. Comm'n*, 681 F.3d 544, 551 (4th Cir. 2012) (noting that the *Citizens United* Court "upheld BCRA's disclosure requirements for all electioneering communications—including those that are not the functional equivalent of express advocacy").

## III.

Analysis of the matters presented in this case properly begins with the question of subject matter jurisdiction, for absent such jurisdiction there is no power to adjudicate any issues. And in this respect, the fundamental governing principal is that the federal courts are confined by Article III of the Constitution "to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). The Fourth Circuit has noted that "[a]lthough the phrasing [of ripeness and standing] makes the questions of who may sue and when they sue seem distinct, in practice there is an obvious overlap between the doctrines of standing and ripeness." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quoting Erwin Chemerinsky, Federal Jurisdiction § 2.4 (4th ed. 2003)).[18] It is paradigmatic that "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560. Standing consists of three basic elements: (i) "the plaintiff must have suffered an 'injury in fact' . . . [that is] concrete and particularized," (ii) "there must be a causal connection between the injury and the conduct complained of," and (iii) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.*[19]

In order to have standing in a pre-enforcement challenge, a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Yet, importantly, a

---

[18] As the Supreme Court has explained, "[a]ll of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Allen*, 468 U.S. at 750 (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C. Cir. 1983) (Bork, J. concurring)).

[19] *See also Miller*, 462 F.3d at 316.

plaintiff "does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough." *Id.* (citing *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). Thus, in order to "establish standing for a pre-enforcement challenge to a regulation, it is enough to 'allege[ ] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [regulation].'" *Virginia Soc'y for Human Life, Inc. v. Fed. Elec. Comm'n*, 263 F.3d 379, 389 (4th Cir. 2001) (quoting *Babbitt*, 442 U.S. at 298).

HLF, in the current circumstances, clearly meets the pre-enforcement standing criteria because HLF has alleged an intent to engage in a course of conduct—the publication of the advertisements—that is protected by the Constitution, but potentially impermissibly burdened by FECA's disclosure requirements. As such, there is no doubt that HLF, in the absence of a remedy, will suffer an injury in fact that is concrete and particular; that there is a causal connection between the potential injury and FECA's enforcement; and that this enforcement is not speculative.

Particularly pertinent here is the Fourth Circuit's decision in *Virginia Society for Human Life*. There, the Fourth Circuit found that the plaintiff had standing because the plaintiff "alleged an intention to engage in constitutionally protected activities that would fall within the reach of the regulation." *Id.* Further, the plaintiff's injury, the fear of prosecution, was imminent, and immediate, "because it needed to plan the substance and placement of its advertisements" for the 2000 election, which at the time of suit "was only fifteen months away." *Id.* HLF is in an analogous situation to the plaintiff in *Virginia Society for Human Life* because HLF has concrete plans to engage in protected activity, namely broadcasting the proposed advertisements. Indeed, HLF's plans are more concrete than those in *Virginia Society for Human Life*, because HLF has

already planned the specifics of the advertisements, and HLF's injury, the fear of prosecution, is more immediate than in *Virginia Society for Human Life*, because HLF's planned activities fall within the next 60 days. And given that HLF cannot rely on an FEC safe harbor with respect to the advertisements, HLF is in essentially the same position as the plaintiff in *Virginia Society for Human Life*, namely fearing prosecution for engaging in what HLF believes to be constitutionally protected activity, publishing the advertisements without disclosure. Thus, like the plaintiff in *Virginia Society for Human Life*, HLF has standing to bring suit.[20]

Of course, the standing doctrine only answers the question of who may sue, not the question of when a party may sue, which properly is addressed by the doctrine of ripeness. *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quoting Erwin Chemerinsky, Federal Jurisdiction § 2.4 (4th ed. 2003)). Ripeness is a closely related inquiry to standing that arises in the context of pre-enforcement challenges. *See Allen*, 468 U.S. at 750 (identifying ripeness as a doctrine that "cluster[s] about Article III").[21] Specifically, ripeness "prevents judicial consideration of issues until a controversy is presented in 'clear-cut and concrete form.'" *Id.* (quoting *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584 (1947)). In order to decide

---

[20] More recently, the United States District Court for the District of Columbia held that a Political Action Committee had standing to "seek a preliminary injunction to enjoin the Federal Election Commission . . . from enforcing 2 U.S.C. §§ 441a(a)(1)(C) & 441a(a)(3) against [the political action committee] for its planned solicitation and acceptance of unlimited contributions . . . ." *Carey v. Federal Election Commission*, 791 F.Supp.2d 121, 125, 132–33 (D.D.C. 2011). There, too, the Commissioners deadlocked and failed to issue an advisory opinion, thereby leaving the plaintiff "liable for actions against them should [they] solicit more than the applicable limits currently allowed under [the relevant statutory provisions] for independent expenditures." *Id.* Although FEC suggested, "that it will probably not enforce its rules," the court held that the pre-enforcement challenge was appropriate. *Id.* at 133.

[21] *See also South Carolina Citizens for Life, Inc. v. Krawcheck*, 301 F.App'x 218, 220 (4th Cir. 2008) (discussing ripeness in the context of challenges to state election law); Erwin Chemerinksy, Federal Jurisdiction § 2.4, at 118 (5th ed. 2007) (describing ripeness as involving the question of "when a party may seek preenforcement review of a statute or regulation").

whether a claim is ripe, a court must determine (i) "the fitness of the issues for judicial decision" and (ii) "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Under the first prong, the Fourth Circuit has made clear that "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller*, 462 F.3d at 319. Under the second prong, hardship "is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of enforcement of the challenged law." *Id.* In the context of a First Amendment claim, a plaintiff must only show "a 'credible threat of prosecution,' rather than a 'threat of specific future harm,'" *South Carolina Citizens for Life*, 301 F.App'x at 221 (citations omitted), because "[t]here are short timeframes in which speech can have influence." *Citizens United*, 130 S.Ct. at 895. Indeed, in the context of federal election law, the Supreme Court noted that because of the "complexity of the regulations and the deference courts show to administrative determinations, a speaker who wants to avoid threats of criminal liability and the heavy costs of defending against FEC enforcement must ask a governmental agency for prior permission to speak." *Id.*

These principles, applied here, compel the conclusion that this pre-enforcement action for a declaratory judgment is ripe for adjudication. First, there is no doubt that the question presented is fit for judicial decision because the parties agree that with respect to this question, there are no disputed facts and there is no need to develop further the factual record.

With respect to the hardship prong, there is clearly a credible threat of prosecution or civil enforcement action against HLF in the event that it publishes the advertisements without disclosure. Even though the FEC has deadlocked on the advertisements,[22] that does not foreclose

19

the Department of Justice from bringing a criminal prosecution, nor does it foreclose a private party from filing a complaint with the FEC. Although the FEC may vote against opening an investigation based on a private party complaint, the decision not to investigate is subject to review by a district court. Any of the commissioners may change their minds or the composition of the FEC may change prior to the running of the statute of limitations. All of these factors point persuasively to the conclusion that HLF faces a credible threat of prosecution or civil enforcement in the event the advertisements are published without disclosure and the advertisements are deemed electioneering communications. Thus, HLF has alleged a sufficient hardship for this case to be ripe for adjudication.

This conclusion comports with the recent decision by the United States Court of Appeals for the District of Columbia Circuit in *Unity08 v. Federal Election Commission*, 596 F.3d 861 (D.C. Cir. 2010). There, the plaintiff sought an "an advisory opinion from the Federal Election Commission on the question of whether it would be required to register as a political committee before selecting candidates." *Id.* at 863. The FEC denied the plaintiff a safe harbor and, instead, issued an advisory opinion finding that the plaintiff was subject to registration. *Id.* In response to the suit later filed by the plaintiff, the FEC argued that the matter was not appropriate for judicial review. *Id.* at 864. The D.C. Circuit rejected this position, explaining that because "parties are commonly not required to violate an agency's legal position and risk an enforcement proceeding before they may seek judicial review," and the plaintiff's only "other route for seeking judicial review of the unfavorable advice would be to disregard the Commission's

---

[22] For the purposes of litigation, the FEC General Counsel has taken the position that the advertisements are electioneering communications. As explained *infra*, this is a litigation position that does not receive any deference. Further, although the FEC General Counsel could not explain the basis for taking the position of a non-majority bloc of the FEC, it appears to be a reasonable position, as it prevents the FEC from later being precluded from determining that the proposed advertisements are electioneering communications.

opinion and risk enforcement penalties," the matter was ripe for judicial review. *Id.* Although HLF did not request an FEC advisory opinion and has not itself been denied a safe harbor, HLF faces nonetheless a hardship analogous to that suffered by Unity08. Although the FEC rightly points out that HLF's speech is only chilled by HLF's decision not to disclose, the Supreme Court has repeatedly emphasized that disclosure itself is a burden on political speech and political association rights. *See, e.g., Citizens United*, 130 S.Ct. at 914. Thus, HLF has alleged a sufficient hardship to render this matter ripe for adjudication.

Finally, because it is well established that district courts are "under no compulsion to exercise . . . jurisdiction" under the Declaratory Judgment Act, 28 U.S.C. § 2201, a district court must decide whether it is appropriate to exercise its declaratory judgment jurisdiction. *Brillhart v. Excess Ins. Co. of Amer.*, 316 U.S. 491, 494 (1942). In this regard, the Supreme Court has explained that district courts are vested "with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995). In the Fourth Circuit, "a federal court has the discretion to decline to entertain a declaratory judgment action, but . . . the court must do so only for 'good reason.'" *Continental Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994). Thus, a district court "is obliged to rule on the merits of a declaratory judgment action when declaratory relief 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Volvo Const. Equip. N. Amer., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). Here, the exercise of declaratory judgment jurisdiction is appropriate for the same reasons that the matter is ripe for

adjudication. A declaration here will serve the useful purpose of clarifying the law and affording HLF relief from the hardship it currently faces.

## IV.

Analysis next turns to the merits, namely whether the proposed advertisements constitute electioneering communications. FECA, as amended by BCRA, provides that an electioneering communication that refers to a candidate for President or Vice-President consists of three elements:

(i) a "broadcast, cable, or satellite communication,"
(ii) that "refers to a clearly identified candidate for Federal office," and
(iii) is "made within . . . 60 days before a general, special, or runoff election for the office sought by the candidate."

2 U.S.C. § 434(f)(3)(A)(i).[23]  In this case, there is no dispute that the proposed advertisements satisfy the first and third elements; rather the dispute focuses on the second element, namely whether the advertisements refer to a clearly identified candidate. This second element is further defined by § 431, which provides three ways in which an advertisement may contain a reference to a "clearly identified" candidate:

(i) "the name of the candidate involved appears;"
(ii) "a photograph or drawing of the candidate appears;" or,
(iii) "the identity of the candidate is apparent by unambiguous reference."

2 U.S.C. § 431(18). Here, there is no dispute with that the advertisements do not contain "the name of the candidate" or "a photograph or drawing of the candidate"; instead, the dispute focuses on whether "the identity of the candidate is apparent by unambiguous reference." FEC regulations[24] provide further guidance, as the regulations provide that clearly identified means,

---

[23] There are four statutory exceptions to electioneering communications, none of which is applicable here. *See* 2 U.S.C. § 434(f)(3)(B).

[24] There is no dispute between the parties as to the validity and applicability of these regulations.

the identity of the candidate is otherwise apparent through an unambiguous reference such as "the President," "your Congressman," or "the incumbent," or through an unambiguous reference to his or her status as a candidate such as "the Democratic presidential nominee" or "the Republican candidate for Senate in the State of Georgia."

11 C.F.R. § 100.29 (b)(2). Thus, the question presented is whether any of the five proposed advertisements contain references such that the identity of a federal candidate is "apparent by unambiguous reference." 2 U.S.C. § 431(18).

The parties have not cited any authority, nor has any been found, that elucidates this statutory phrase. Nonetheless, it is well-established that courts must give the plain language of a statute its ordinary and unambiguous meaning.[25] And the ordinary and unambiguous meaning of the phrase "the identity of the candidate is apparent by unambiguous reference," is that the identity of the federal candidate would be apparent, i.e., clear to a reasonable, objective person viewing the advertisement in the context of the reference. This reading of the provision, and particularly the addition of context, finds firm support in the statute's structure. This is so because the statute establishes two direct means of identifying the candidate—the candidate's name or image—and a third means of identifying the candidate which logically must include context. This understanding comports with the examples provided in the FEC's regulation, such as references to the candidate's current political office status, e.g. "the President" or "the incumbent," or to the candidate's status as a political candidate, e.g. "the Democratic presidential nominee." 11 C.F.R. § 100.29(b)(2). In the context of an advertisement touching on national Executive branch policy, the term phrase "the President" is an unambiguous reference because it could only be reasonably understood to refer to a candidate for federal office—as opposed, for

[25] *See United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) ("We remain mindful that in interpreting the plain language of a statute, we give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended the statute's language to bear some different import.") (internal quotations omitted).

example, to the president of your employer. And, in such a communication, it would be clear to any reasonable viewer that the "the President" refers to the current sitting President of the United States, Barack Obama, and not to past Presidents, such as George W. Bush or William J. Clinton.

HLF argues for a non-context specific standard, such that the standard for clearly identified is whether the terms used in the advertisements are explicit and unambiguous without regard to the context of the term's usage. HLF argues that the term "the Administration" is ambiguous, because although it could refer to President Obama, it could also refer to the Executive Branch as a whole. The flaw in this argument is that § 431(18) does not call for the application of a standard that is independent of context, nor would such a standard make sense, for the meaning of any term or reference typically depends on the context. Indeed, the examples in the regulation make clear that context is relevant. For example, § 100.29(b)(2) identifies "the incumbent" as a reference to a clearly identified candidate, but whether it is apparent that "the incumbent" is an unambiguous reference to a federal candidate depends on context. In one context, "the incumbent" may refer to a city council member while in another it may refer to the current President of the United States. One must therefore look both to the context of the reference as well as to the meaning of the reference itself.

Before applying § 431(18), it is important to address the parties' disagreement over whether there is any FEC action deserving of deference here. Despite the FEC's arguments to the contrary, the FEC's position in this litigation warrants neither *Chevron*[26] nor *Skidmore*[27] deference. It is well-established that part of the first step in *Chevron*—the so-called "step 0"—is to determine whether the agency acted in a manner entitled to *Chevron* deference. *United States*

---

[26] *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984).

[27] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

24

*v. Mead Corp.*, 533 U.S. 218, 233 (2001). Here, because the FEC deadlocked on whether the advertisements are electioneering communications, there is simply no basis for giving deference to the views of the commissioners who voted against draft A, the draft that would granted a safe harbor, as opposed to those who voted for it. The FEC counters, arguing that the group of commissioners who voted against granting a safe harbor to the advertisements acted in a manner deserving deference. In support, the FEC cites *Federal Election Commission v. National Republican Senatorial Committee*, 966 F.2d 1471 (D.C. Cir. 1992). There, the FEC was presented with a complaint from a private party and was required to consider whether there was probable cause to believe a violation of FECA had occurred. *Id.* at 1474. In that case, the FEC deadlocked (3:3), and thus was required to dismiss this private party's complaint. *Id.* On those facts, the D.C. Circuit held that the dissenting Commissioners "constitute a controlling group for purposes of the decision [and that] their rationale necessarily states the agency's reasons for acting as it did." *Id.* at 1476. *National Republican Senatorial Committee* is readily distinguishable from this case. In that case, the deadlock amounted to final agency action that was reviewable in federal district court, unlike the deadlock in this case which is not, and did not result in, reviewable agency action. Put simply, the deadlock in *National Republican Senatorial Committee* resulted in the dismissal of a private complaint, whereas the deadlock in the present case results only in the FEC concluding that it was unable to reach a determination on the proposed advertisements. This conclusion is in no sense final, reviewable agency action.

In sum, there is in this case no policy statement, regulation, or ruling that constitutes the basis for the FEC's position in this litigation; instead there is only the position of the FEC General Counsel, which is nothing more than the putative litigation position of the FEC that is not entitled to any deference. As the Supreme Court explained in *Bowen v. Georgetown Univ.*

25

*Hosp.*, 488 U.S. 204 (1988), that "[w]e have never applied the principle of [*Chevron*] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." 488 U.S. at 212. In *Bowen*, the Supreme Court "declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.'" *Id.* (quoting *Investment Co. Inst. v. Camp*, 401 U.S. 617, 628 (1971)). Thus, because the position taken in this matter is only a litigation position of the FEC's General Counsel, and not the policy or position of the FEC itself, no *Chevron* deference is warranted.

Likewise, the FEC's General Counsel's position in this case does not warrant *Skidmore* deference. This lesser degree of deference means that a "court defers to an agency interpretation only if and to the extent that it is persuasive." *Shipbuilders Council of Amer. v. U.S. Coast Guard*, 578 F.3d 234, 241 (4th Cir. 2009). *Skidmore* deference is based on the recognition that the "rulings, interpretations and opinions of [an Agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts . . . may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Yet here there is no ruling, interpretation, nor opinion of the agency; there is only a deadlocked FEC and there is no reason to defer to the reasoning or conclusion of one side of the deadlock as opposed to the other. There is therefore no basis for deferring to the FEC's judgment or expertise and it is now appropriate to apply the elucidated understanding of § 431(18) to HLF's proposed advertisements.

### 1. Advertisement One

Proposed Advertisement One is an electioneering communication because it is apparent that the references to "the White House" and "the Administration" are contextually unambiguous references to a candidate for federal office, namely President Obama. To be sure, as HLF argues, "the White House" and "the Administration" are not explicit references to a candidate for federal office because depending on the context, the terms may refer to the institution rather than to a candidate. But this is not persuasive because whether "the White House" and "the Administration" are unambiguous references to a candidate for federal office is wholly dependent on the context of the term within the advertisement. Here, in the context of the advertisement, it is clear that "the White House" and "the Administration" can only reasonably refer to current-President Barack Obama. The advertisement states "since this Administration began" and "the White house *says*" while referring to the policies and actions of the President and showing images of the White House. And the advertisement instructs viewers to "tell the White House it's time for an American energy plan." Thus, it is clear in this advertisement that "the White House" and "the Administration" are being used as synonyms for President Obama. The conclusion that this advertisement is an electioneering communication comports with a stated goal of the BCRA amendments to FECA, namely the need to address the use of a so-called "issue advertisement" to advocate for or against a candidate for federal office. *See McConnell*, 540 U.S. at 126–32. Thus, it is appropriate to conclude that to a reasonable person, it is apparent that in the context of this advertisement, "the White House" and "the Administration," while not explicit, unambiguously refer to President Obama.

27

### 2. Advertisement Two

Advertisement Two is not an electioneering communication because it is not apparent that the reference to "the government" is a contextually unambiguous reference to President Obama. In this advertisement, an audio clip of President Obama speaking only an eight word sentence is immediately preceded by the announcer saying "the government says." Other than the audio clip, there is no other reference to President Obama, nor is there any reference to "the White House" or to "the Administration."

As HLF correctly argues, because the audio clip of President Obama is not identified as such, whether the advertisement refers to President Obama depends entirely on whether the viewer actually recognizes the voice of the person speaking. Although the FEC argues that President Obama's voice is widely recognized, there is no factual basis for reaching this conclusion. Significantly, the FEC offered no surveys or other evidence to warrant the conclusion that the average listener would recognize President Obama's voice simply by hearing an eight word sentence. In the absence of such evidence, there is no way to conclude that the reference to "the government" in this advertisement is a contextually unambiguous reference to President Obama.

### 3. Advertisement Three

Proposed Advertisement Three is not an electioneering communication because it is not apparent that references either to "the government" or to "the White House" are contextually unambiguous references to a candidate. The FEC argues that the text instructing viewers to call the White House is a reference to a clearly identified candidate in the context of the audio clip of the White House Press Secretary. This is not persuasive. In some contexts, "the White House" may refer to the President, but here it does not unambiguously do so because this advertisement

28

only directs viewers to express their opinions about oil supply policy to the government by calling "the White House." There is no indication in the advertisement that either the White House or the President takes the opposite view about oil supply policy. Although there is an audio clip of the White House Press Secretary, there is no identification as such and there is nothing in the record to suggest that an objective listener would recognize the voice of the White House Press Secretary. Since in this advertisement, it is not apparent that either "the government" or "the White House" unambiguously refers to President Obama, this advertisement is not an electioneering communication.

### 4. Advertisement Four

Advertisement Four is an electioneering communication because it is apparent that "the Administration" is a contextually unambiguous reference to President Obama. In Advertisement Four, "the Administration" is used in the context of telling viewers to call Secretary Sebelius to "tell her that it's wrong for her and the Administration to trample [this right]" while displaying footage of the White House. This combination of "the Administration" as an entity separate from Secretary Sebelius with the footage of the White House makes clear that "the Administration" refers to President Obama—he is the head of the Administration and he resides, and works, at the White House.

HLF contends that "the Administration" is ambiguous as a reference to President Obama because in the abstract, "the Administration" could refer to the entire Executive Branch. But, there is no ambiguity when the reference is analyzed in the context of the entire advertisement. After all, even a term like 'the incumbent' may be ambiguous if considered outside of the context of its usage, but once context is considered, the reference to such a term may lose its ambiguity. So, too, the context here resolves any ambiguity, and it is, therefore, appropriate to

conclude that it would be apparent to a reasonable viewer that the reference to "the Administration," as used in Advertisement Four, refers unambiguously to President Obama.

### 5. Advertisement Five

Advertisement Five is an electioneering communication because it is apparent that the term "the parent" is a contextually unambiguous reference to President Obama. In Advertisement Five, the announcer refers to "the parents of government run health care" and "its family" while the text "White House will not mark two year anniversary" is displayed. Taken together, this combination of footage and audio is a clear reference to President Obama; there are two "parents" to the health care bill, Congress and the President, and the text that refers to the White House makes clear that "the parent" referred to in this advertisement is President Obama.

HLF argues that the only way to determine that this is an electioneering communication is to focus on the subjective intent of the speaker, instead of the language of the advertisement. This is not persuasive because it is not the intent of the speaker that drives the conclusion, but instead the context of the advertisement. Indeed, as the FEC rightly points out, Advertisement Five is an electioneering communication because a reasonable viewer could only conclude that the term "parent" unambiguously refers to President Obama.

### V.

Given that three of HLF's five proposed advertisements constitute electioneering communications, it is appropriate next to consider HLF's as-applied challenges to the electioneering communication statutes. Specifically, HLF argues that the electioneering communication disclosure provisions, as-applied to these advertisements, (i) violate HLF's First Amendment right to political speech and association by impermissibly requiring disclosure for

'issue advocacy' and (ii) violate HLF's Fifth Amendment due process rights by being unconstitutionally vague.[28] Both arguments fail.

HLF's First Amendment argument fails to persuade. Both the Supreme Court and the Fourth Circuit have made clear that FECA's disclosure requirements for electioneering communications are constitutional because they are justified by the public's interest in knowing who is speaking about a candidate during the election period. *See Citizens United*, 130 S.Ct. at 914; *Real Truth About Abortion*, 681 F.3d at 551 (noting that *Citizens United* "upheld BCRA's disclosure requirements for all electioneering communications—including those that are *not* the functional equivalent of express advocacy"). In order to decide that the application of FECA's electioneering and disclosure provisions to these advertisements is unconstitutional, one must first conclude that the advertisements do not contain unambiguous references to candidates for federal office and must therefore conclude that the statute was misapplied to these advertisements. Thus, HLF's argument is a statutory argument rather than a constitutional one, and because three of the five advertisements contain unambiguous references to a candidate, this argument fails.

Second, contrary to HLF's contention, the FECA electioneering communications and disclosure provisions are not vague or overly broad. A statute is unconstitutionally vague when "it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute[.]" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). When a "statute's literal scope . . . is capable of reaching expression sheltered by the First

---

[28] *Citizens United* also left open the possibility of as-applied challenges "if a group could show a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." 130 S.Ct. at 914. HLF has not made such allegations and has not made a such a showing in this case.

Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Yet, a regulation or statute "is not vague because it may be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *F.C.C. v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012). Thus, the vagueness doctrine links two "discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

HLF is challenging FECA's electioneering communications and disclosure provisions on the basis of the second concern, namely that the application of the provisions to the advertisements is an arbitrary enforcement of the law. Stated simply, HLF argues that the advertisements do not contain references to clearly identified candidates, and therefore, the only way to deem the advertisements electioneering communications is to adopt a vague or overbroad construction of FECA. This argument fails because, in essence, it begins the analysis with the predetermined conclusion that the advertisements do not contain a reference to a clearly identified candidate. But that is not how the analysis has proceeded; instead, the advertisements were each analyzed to determine whether it would be apparent to a reasonable viewer that the advertisement contained a contextually unambiguous reference to a candidate. It was only after this determination was made that the advertisements were deemed electioneering communications. Indeed, as is the case with HLF's as-applied First Amendment challenge, this vagueness and overbreadth challenge is also nothing more than a statutory argument, namely that the advertisements are not electioneering communications. Thus, because three of HLF's five advertisements are properly deemed electioneering communications, the provisions have been properly applied and the provisions are not vague or overbroad.

## VI.

In summary, HLF has standing to bring this action for a declaratory judgment, and this matter is ripe for adjudication because HLF faces a real legal hardship. Without an advisory opinion to provide a safe harbor, HLF must either disclose its contributors, forego speaking, or risk civil, or criminal, penalties if its advertisements are later determined to be electioneering communications. In evaluating each of the advertisements, FECA requires courts to apply an objective viewer standard to determine whether an advertisement contains a reference to a clearly identified candidate for federal office. Here, three of the five proposed advertisements are electioneering communications: Advertisements One, Four, and Five. Advertisements Two and Three do not contain a reference to a clearly identified candidate for federal office. And finally, HLF's as-applied challenges to FECA's electioneering communications and disclosure provisions fail, because both challenges are, in essence, statutory challenges that allege a misapplication of the provisions at issue.

An appropriate Order will issue.[29]

Alexandria, VA
October 04, 2012

/s/

T. S. Ellis, III
United States District Judge

---

[29] HLF also sought injunctive relief. No compelling reason has been offered for injunctive relief and, therefore, the request for an injunction is denied.